## THE CITY OF NAPLES.

### THE CITY OF SHEBOYGAN.

### HART v. THE CITY OF NAPLES.

(Circuit Court of Appeals, Seventh Circuit.  June 12, 1897.)

#### No. 265.

COLLISION—STEAMER AND SAIL IN SLIP—BREAKING ADRIFT IN GALE.

A sailing vessel, which leaves a probably safe mooring, and, in the face of a dangerous and increasing gale, comes into a slip, and moors under the lee of a steamer already there, in such a position that, if the lines of the latter part, a collision will be probable, assumes the risk of injury to herself from such a collision, where all reasonable and ordinary precautions are taken by the steamer by putting out additional fastenings.  The steamer is not bound, under such circumstances, to change her position in the midst of the storm, in order to avoid responsibility for a collision, made possible by the action of the other vessel.

Appeal from the District Court of the United States for the Northern District of Illinois.

Wm. H. Condon (Sullivan & McArdle and Harvey D. Goulder, on brief), for appellant.

Charles E. Kramer, for appellee.

Before WOODS, JENKINS, and SHOWALTER, Circuit Judges.

SHOWALTER, Circuit Judge.   Late at night on the 19th day of April, 1893, the steamer City of Naples collided with the schooner City of Sheboygan, then moored on the west side of the Lighthouse slip in the port of Chicago.   The schooner, laden with 17,000 bushels of corn, and bound for Port Huron, in the state of Michigan, sank as the result of the collision.   This proceeding was instituted by John Hart, owner of the schooner.   After a hearing in the district court, the libel was dismissed, with costs against the libelant.   Pending the hearing, John Hart died, and his administratrix, who prosecutes this appeal, was substituted.

The slip spoken of in the record as the Lighthouse slip is rectangular in form, and about 275 feet wide from west to east.   The precise length from north to south is not stated.   The indications from the record are that the length is about 400 feet.   The south side of this slip is open, that being the place of entry.   What is or was called the "Peshtigo Slip" comes into the Lighthouse slip from the west, its northern boundary or pier being in line with the northern pier of the Lighthouse slip.   The distance from the northern end of the west boundary of the slip last named north to the northern boundary of the Peshtigo slip—in other words, the width of the Peshtigo slip across its entrance into the Lighthouse slip—is not stated; but the Peshtigo slip was wide enough to permit the entry and passage by one another, lengthwise, of large vessels.   On the day and night in question a flotilla of scows, some 8 or 10, each 30 or 40 feet wide and 60 or 80 feet long, lay in the eastern end of the Peshtigo slip, and across the northern portion of the Lighthouse slip.   The eastern pier of the slip last named was about 20 feet wide.

How far it projected above the ordinary water line is not stated. From the southern terminus of this eastern pier another pier extended easterly, perhaps 800 feet, into the open sea.. The latter pier was higher by 3 feet than the eastern pier of the Lighthouse slip. On the day and night in question the large schooner Golden Age lay along the southern side of this latter pier, her bow to the east and her stern 50 feet from the exterior angle made, as described, by the two piers. On this corner stood a stout spile, whereto was fastened one or more lines from the Golden Age. Thus placed, and with lines to other spiles further east on the pier, the Golden Age safely rode out the storm which prevailed on the afternoon and night of the 19th of April, 1893, as mentioned later in this opinion. The southwestern angle of the Lighthouse slip is the eastern terminus of the northern boundary of the Chicago river. Between the southern pier or boundary of the Peshtigo slip and the said northern pier or boundary of the river, extends a tongue of dry land to the western pier or boundary of the Lighthouse slip. For two or three weeks prior to the 19th day of April, 1893, the steamer John B. Lyon lay in the Lighthouse slip alongside the eastern pier, and moored thereto. On the day in question she lay with her bow projecting south of or across the southern boundary or line of entrance into the slip. She was made fast by lines at intervals to the pier, her bow lines being attached to the spile above mentioned as holding the stern lines of the Golden Age. On the morning of the said 19th of April, the steamer City of Naples arrived in the port of Chicago. For want of an accessible berth up the river, which was at that time crowded, and by direction of the harbor master, the Naples entered the Lighthouse slip, and tied up alongside the Lyon, her bow to the north, and projecting 60 or 65 feet beyond the stern of the Lyon, and her fantail, according to some testimony, on a line with—according to other testimony projecting a few feet beyond—the bow of the Lyon. The Naples was a large vessel, 320 feet over all, with 42-feet beam. The top of her pilot house was 48 feet, and her forward upper deck 35 feet, above the water. She drew 11 feet aft and 4½ feet forward. The Lyon was 255 feet long, and was loaded. The testimony does not affirmatively show exceptional weather conditions when the Naples first took this position. At noon on that day there was a gale from the east of 40 miles an hour. The velocity of the wind increased through the afternoon and night. At dark the velocity was 52 miles an hour. Shortly before 2 o'clock that night the velocity was 72 miles an hour, still directly from the east, and across 60 miles of open sea. The direction and force of this storm were unusual and extraordinary, even at that season of the year. At the hour last mentioned the water was, and had for some time been, pouring over the eastern pier of the Lighthouse slip, and threatening to cast against or upon or over that pier the barge Mike Corry, which, under stress of the storm, had drifted, dragging two anchors, from the outside into that vicinity. The night was dark and cold, and rain was falling.

It will be seen from what has been said that the after portion of the Naples, which lay deep in the water, was immediately in the

lee of the pilot house and texas of the Lyon, the comparatively high pier which extended easterly, and the stern of the Golden Age; while the bow of the Naples, with the structures thereon, was exposed to the full force of the blast from the east, the lower pier on that side and the low after portion of the Lyon, as far as it extended, affording little or no shelter. Shortly before 1 o'clock that night, and when the velocity of the storm had reached 64 miles an hour, the after lines of the Naples first snapped, then her lines amidships. Her bow lines held, but her stern went adrift, under the driving force of the wind. Between 3 and 4 o'clock in the afternoon the mate had replaced the six-inch line first used at her bow with a nine-inch hawser, carrying one end of the latter forward of the bow and attaching it to a stringer on the east pier near the north corner of the slip, and carrying the other end aft to another stringer, so that the bow might be held in position and the ranging of the vessel prevented. Before 6 o'clock two additional lines (making three at that place) were extended from the timberhead of the Naples forward of the boiler house, diagonally across the Lyon, and with a straight and unobstructed lead to the spile already mentioned near the southeast angle of the slip. Other lines, afterwards increased to the number of five or six, led from the stern of the Naples across to, and were made fast on, the bow of the Lyon. These latter were five-inch lines. Those forward of the boiler house were six-inch. lines. Some of these lines were entirely new, and all were good lines. When asked why he did not extend his lines from the stern of the Naples to the spile on the pier, the mate answered that he could not do so without passing them around the projecting stem of the Lyon. The testimony is that all of the lines which the Naples had—and she was supplied with a full complement, according to the witnesses—were in use when her stern went adrift.

About dark, or a little before, on that day, the Sheboygan, which had up to that time been moored to the north pier of the river west of the Lighthouse slip,—a place where she could have remained in safety, being there end on to the storm and, apparently, less exposed than the Golden Age,—left that position, and, intent, apparently, upon greater safety, was towed into the Lighthouse slip. She there took a berth, and was tied up alongside the western pier, and immediately west and under the lee of the Naples. When this was done, the velocity of the wind was at least 50 miles an hour, and constantly increasing. When towards 1 o'clock that night the after lines of the Naples parted, as already said, her stern, by stress of the storm, was driven away from the Lyon and against the Sheboygan, doing some trifling damage. Her engines were at once started, her helm put hard a-starboard, and by force of her rudder against the current of her wheel her stern was carried towards the Lyon, and some 20 or 30 feet from the side of the Sheboygan. Here she remained, steaming against the force of the storm, and driven a little forward with her bow wedged among the scows, for nearly an hour, when one of her rudder chains was broken, apparently by some obstruction, supposed to be a floating timber, getting caught in her wheel. The rudder no longer responded against the current made by the wheel,

and her stern was thrown once more against the Sheboygan, striking the schooner well forward, and making the hole which sank her 20 minutes later. The Naples was driven still further forward by the slanting force of the wind. Her engine had been stopped when the rudder chain broke. It is testified that up to this time her bow lines, or one of them, still held. However that may be, and whether the stringers on the pier, to which the ends of the hawser were attached, were pulled loose then or before, it is certain that no damage resulted to the Sheboygan through any default in the forward lines or fastenings of the Naples. Her bow, as stated, was wedged tightly between the scows. The second mate at this time cut the lines which held the scows, and thereupon the bow of the Naples swung round, and she drifted into the Peshtigo slip, driving the flotilla of scows ahead of her. Before the stern lines of the Naples first parted, she had signaled repeatedly for a tug by blowing her whistle. When she first went adrift, she signaled again; and, while steaming against the wind, as described, after the initial collision, she whistled repeatedly. But no tug came until after the final collision. It is testified, however, that under the conditions then existing—or as they had been since 9 o'clock that night—it would hardly have been possible for a tug to render any assistance. During the interval, while the Naples was held away from the Sheboygan by her wheel and rudder, her crew, some of whom climbed down on the scows, and thence reached the pier, attempted to get lines out once more, but were unable to do so.

Under the circumstances above detailed, what was the extent of the obligation due from the Naples to the Sheboygan? The Vivid, 1 Asp. 601, was a collision case. The schooner Vivid was moored with her bow towards the shore. She was held by her starboard anchor, the chain thereof leading aft, and a spring line from her starboard quarter to said anchor chain, and by a line or warp fast to a capstan on shore. The schooner Victor, with her bow also to the shore, lay west of the Vivid, securely moored, and held in position by means of shore and anchor lines. The wind, being from the south, freshened, changed, and blew strong from the southeast. The lines of the Vivid were then made taut and her line to the shore was moved to another capstan further away from the Victor; but her stern, in spite of her fastenings, was blown around to the westward, and in collision with the Victor. Her port counter striking the starboard quarter of the Victor, the latter vessel was thereby sunk. The fastenings of the Vivid proved insufficient to hold her in position under stress of the wind. A line from her starboard quarter to the shore, or a second anchor, would have held her. Moreover, these means, or either of them, were then available. But such means were unusual or extraordinary, and were not needed in the first instance to keep her in position. The court (Sir R. J. Phillimore) ruled that the Vivid was not bound to use these extraordinary precautions, and dismissed the libel. The ground of this ruling was that, after the Vivid had taken her berth, and made fast, as described (but before the change in the wind), the complaining vessel, Victor, took the berth which made the collision possible. In other words,

and in the language of the sea, the Victor had given the Vivid a foul berth. The Victor, it may be said, had the right to be where she was, but she took the risk of the collision. She could not impose on the Vivid any duty to use extraordinary precautions. Both vessels were engaged in unloading coal, and for this purpose their fastenings were meant to hold them in the positions described with their bows to the shore. In the case at bar the Sheboygan became voluntarily a part of the dangerous situation. When she took a berth under the lee of the Naples, the crew of the latter vessel were already getting out additional lines. The storm was fairly on, and increasing in violence. That a collision, possibly disastrous to one vessel or the other, would take place if the stern of the Naples were blown adrift, was a consequence easily discernible. The Naples was not in relation with the Sheboygan at all, and owed no duty to her until she chose to take the new berth at nightfall. Could the Sheboygan by this maneuver create, as against the Naples, any obligation beyond that of using reasonable and ordinary precautions with the means available in her then position, and in the then state of her environment, to prevent collision? Let it be conceded—though the evidence upon the point is conflicting—that by some use of her hawser (which was 720 feet long) different to that in fact made, it was possible to have held the Naples fast; or that, after the Sheboygan had taken her berth, the Naples might, in the face of the storm, have loosed her moorings and found a place of safety elsewhere, either in the river or in the Peshtigo slip; or that she might have moved further forward on the east side of the Lighthouse slip, and attained more secure fastenings, though this could hardly have been done, is she therefore liable to the Sheboygan? In the light of the case above cited, and on what would seem the rational view of the matter, we think not. To hold a vessel at her moorings is not the ordinary or appropriate function of a hawser. The hawser in this instance was voluntarily put out to hold the forward portion of the Naples before the Sheboygan came into the situation. It thereafter remained where it had been put. We cannot say from the evidence that this, under the circumstances, was not the reasonable and proper use of the hawser. The position of the Naples, the berth occupied by her, and its environment, were apparent to the Sheboygan when the latter vessel came into the place of danger. Is it law that the Naples became at once bound to change her position, or else be responsible for a collision which the maneuver of the Sheboygan made possible under weather conditions then present? It is suggested that when the rudder chain broke—and the evidence is that this chain had been inspected within a week, and was then sound and staunch—the crew should have shipped the tiller. It is said that by this means the rudder could have been brought again under control, and the Naples kept away from the side of the Sheboygan. As indicating the fury of the storm, a few minutes after the Naples first parted from the Lyon the strong and sound after timberhead of the latter vessel snapped under the strain of her lines, and her stern was blown from the pier till she went aground. When the rudder chain of the Naples broke, as above stated, the velocity of the wind

had increased to 72 miles an hour, and the stern of the Naples was then only 20 feet, or thereabouts, away from the Sheboygan. We cannot say, and no witness has testified, that under the circumstances as shown in the evidence it would have been practical to arrest the swift movement of the vessel, and avoid the threatened collision, by any substitution of other steering apparatus in the emergency of the broken rudder chain. There is no satisfactory basis for any finding of negligence on this account; nor can it be fairly concluded that the crew of the Naples, at any time after the Sheboygan came into the slip, so far failed in reasonable endeavors and precautions with the means at hand as to make the Naples liable to the Sheboygan. The decree of dismissal is affirmed.

JENKINS, Circuit Judge. I concur in the result reached, but upon the ground that under the circumstances no fault is cast upon the City of Naples. The harbor above the bridge was closed to her by reason of the congestion of shipping there. She was, therefore, compelled to seek such shelter as was afforded by the Lighthouse slip. The testimony declares that she used all proper and necessary appliances for secure mooring both before and during the storm. Indeed, it cannot be justly said that any proper effort was wanting to secure her in her position during the prevalence of the gale. If fault there was, it arose from taking a position outside the Lyon; but that would seem to have been a necessity of the situation. It does not satisfactorily appear that she could have done otherwise.

I have doubted whether the City of Naples was not in fault for failure to ship her tiller, and start her engines after her rudder chains broke, and thereby keep her stern away from the Sheboygan. The evidence upon this point is quite meager and unsatisfactory, and but little stress seems to have been placed upon it. At the time of the breaking of the rudder chains the stern of the City of Naples was but 20 or 30 feet away from the Sheboygan, and, in a gale of wind of 72 miles an hour driving her stern directly towards the Sheboygan, it may be doubted if the maneuver of shipping her tiller, starting her engines and obtaining sufficient headway to prevent the collision, could have been successfully adopted. At all events, the evidence upon that subject is too inconclusive to warrant a finding of fault. As I read the testimony, there was nothing, other than the prevalance of the gale, to indicate to the master of the Sheboygan, when she moved into the slip and moored at the dock opposite to the City of Naples, that the latter was either insecurely moored, or was liable to part her lines. I therefore reserve my judgment whether the ruling in the case of The Vivid, referred to in the opinion of the court, is applicable here. I do not know that the doctrine of "foul berth" has been applied to vessels moored to a dock.